Case 23-3404, Tina Root v. Decorative Paint Inc. Argument not to exceed 15 minutes per side. Counsel, when you're ready, you may proceed for the appellant. Good morning, Your Honors. Fred Bean on behalf of the appellant, Tina Root. With your permission, I'd like to request four minutes for rebuttal. Very well. Thank you. Your Honors, this is an ADA case, Failure to Accommodate in Disability Discrimination. It's not an overly complex case in terms of the facts which have been presented to you by briefing, but I want to start with what this case is not. It's not a Hofstetler v. College of Worcester case which this court decided in 2018. In that case, this court reversed summary judgment on ADA claims because there were questions of fact. In that case, there was specific evidence presented by both sides that there was actually an individualized inquiry into the disability. There was actually an interactive process that was conducted. Even in the facts in Hofstetler, which was still reversed, this court acknowledged that the employer actually engaged in some of those steps. They actually met with the employee. They actually went through the qualifications, the possible accommodations. This case is not Hofstetler. This case does not come close to being what Hofstetler is. Not to spend too much time on the facts, but this is a synopsis of this case in a nutshell. Tina Root suffers from chronic COPD and asthma. She performed her job without fault for three and a half years working in a specific department called the Rework Division. There was no painting there. She scuffed parts in this facility. We provided the layout and the original briefs of this facility, and it was located right near the administrative offices. There's no presence of paint fumes around there. Even the expert for Appley concluded that in their own report in this litigation. Then one fateful day after she returns from medical leave, she's placed in an entirely different department on the D-line where actually painting of parts is done, and it's actually located right next to this industrial-sized paint room. She works a 10-hour shift. She has an asthma attack. And then, this is the profound thing, she does what she's supposed to do as an employee under the ADA. She's actually proactive. She recognizes that she has an issue. She calls her doctor that very same day, knows that she has a problem, knows she's going to need to go to her employer to ask for help. So she goes to her doctor. They go through what happened. She even asked her doctor for a letter. They put the letter together as well as they can. Neither one of them are lawyers. My client works in an industrial facility. She's got low education. Her doctor's not a lawyer. They put this letter together as best they can. She goes in the next morning with the thought that, I'm going to get help. I'm going to go to my employer. I'm going to meet with the HR rep, and they're going to help me. Instead, she gives them this letter. She's declared that she's a liability. Those are the exact words used by the two individuals, Robby Robertson and Ms. Fuller, in that room. She's removed from her position, sent home, and they never speak to her again. That's it. Those are the facts. Did they not ask her for additional information from the doctor? No. There is no evidence of that, Your Honor. There is no evidence that they asked her for additional information. And to that very point, and I think this is one of the most critical facts in this case, there is detailed testimony from the HR rep, Ms. Fuller, that for the accommodation process in general, they would give out a medical certification to the employee. And we see that a lot, right? That's a normal thing to do. It's a normal practice. They would give out a medical certification, take this to your doctor, have your doctor fill this out, and provide more information, because that's part of that individualized inquiry that's required. They did not do that. Ms. Fuller testified she did not give her the certification. There was no discussion of the certification. There is no evidence in this case, whether verbal or documented, that there was any remote discussion about her condition, the individualized process, the accommodation she was requesting. Nothing. During the meeting or after. It never happened. And that's why this case, Your Honor, fits squarely. And I preface this by saying it's actually rare, I think, to find a case sometimes that has almost identical facts. But this is a Lovell v. Champion car wash case, which is a Middle District, Tennessee District Court decision. I understand it's not a Sixth Circuit decision, but it's within the Sixth Circuit. And the facts are directly on point. I mean, you couldn't have scripted it any better. And in that case, it was the same type of issue. The employee in question had cardiomyopathy. He presented a letter. The letter was even written almost in the exact same fashion. It said generally that the employee needed to avoid heat due to dehydration. And that's really all it said. Compare that to the letter in this case that Ms. Rue had COPD and needed to avoid these paint fumes. The employee gave it to his boss. His boss looked at it and said, well, now there's a liability here because of this. Precisely what they said in this case. Well, there is a difference between there is a liability and you are a liability, which is what I think you're claiming here. Well, I think even if there's a nuanced way in the way that they phrased it, the meaning is the same. The meaning is the same that they jumped all the way from getting notice of the condition and notice of the problem, jumping and skipping all the steps the ADA requires to immediately coming to the conclusion that you are unqualified. And that's the central issue here because that's where the district court I think kind of got lost in their reasoning. They just immediately jumped to, I guess, taking at face value what Decorative Paint was trying to sell, which was that just by looking at this letter for 10 seconds or however long they looked at it, they could just deem her unqualified. That is not the law. The nice thing about these cases, these issues have been litigated over and over and over and over again. There's no shortage of law. And I would direct the court to one of the principal cases here, Keith v. County of Oakland, which is a Sixth Circuit case, 2013, where this court set out the exact analysis that you have to go through, especially in regard to the qualification element, which is that there has to be a proper evaluation that looks at the personal characteristics of the employee, the actual medical condition, the effect that it actually has on the specific components. And in that case, the facts were on point with this case because this doctor in that case was dealing with somebody who was deaf and it was an issue of whether that individual could be a lifeguard. And the doctor basically just reached that conclusion without conducting the individual inquiry, and this court said that that's not enough. That is literally, in their words, he conducted the type of examination that is precisely the type that the ADA was designed to prohibit. And I would argue even there. Yes, Your Honor. What is your position or your understanding of the employer's position as to whether to continue to employ her would have constituted an undue burden on the employer's business? There seems to be a factual dispute as to whether your client's old job, or I should say her job prior to her making the request for an accommodation, was still open or not. There seems to be some indication that that position was still vacant. I guess that would go to the question of whether she could have gone back to that position. But what's your thinking on all of that? Thank you, Your Honor. And I would address that with two points. And first of all, I would first say, before I address the point directly, that once again, I don't even think we'd get there because of the previous failures up to that point. Because they didn't conduct the other steps that you would even have to conduct to get to the undue burden analysis, there's already a failure at that point, and their defense fails. But to address your specific question. Could you start just back one little bit on Judge Clay's question? What is the evidence in the record that you point to that she asked for an accommodation? The evidence in the record that she requested for the accommodation is a couple-fold. Number one, there was testimony from her that she requested the accommodation. Also, the letter that she presented, which in congruence with her testimony that she requested the accommodation, both Ms. Fuller and Mr. Roberts admitted during their depositions that she requested an accommodation and that they understood that meeting with them was to request an accommodation. So, Your Honor, to answer your question directly, our position would really be that I don't even think there's a dispute, or especially not a genuine dispute of fact that she requested an accommodation, because all the parties in this case have, at least from the evidence that we've obtained through depositions, have admitted that she requested an accommodation. And that's almost where, again, their failure on their side shows up, because they didn't document any of this. They kept no documents of this meeting. They made no documents of going through the interactive process, nothing, which, again, falls on the employer as part of their burden. So when you say that I don't remember, and I'm not going to pretend to know the record as well as you do, so I don't remember a specific discussion in here about her asking for a particular accommodation, and I want to make sure that I'm clear on what you're saying, is what you're saying is that Ms. Root, when she met with the two supervisors, was generally saying, I have this issue, I'm looking for an accommodation, or that Ms. Root said, hey, I have this issue, so I really need to go back to where I was before. I mean, was there a specific request for a specific accommodation? I guess that's my more narrow question following up on Judge Batchelder's. Thank you, Your Honor, both. So when she presented the letter and first went to them, there was a generalized request of aiding help, which, first of all, under the law, under the cases that we've cited, is sufficient in and of itself to then change the burden or shift the burden over to the employer. We cited several cases regarding that. But also, while she was in the meeting, per her testimony that we presented, both through a deposition and also supplemental declaration, she specifically spoke about the rework department, which was the job that, it was her job. I mean, all she wanted to do was go back to her job. And I think that loops me back to, I want to make sure I address Judge Clay's original question about the undue burden. There's no evidence to suggest that the job wasn't open. And furthermore, there's been no evidence presented, and I know I'm out of time, so I'll just finish my thought. Well, you can finish the answer. Sorry, Your Honor. That there's no evidence that they even went through an undue burden analysis because what really happened is when she, when they initially closed down for COVID, the whole rework department, which was, I think, about four or five employees that included Ms. Rue, instantly came back within 48 hours. That's the undisputed testimony. So it was considered a necessary job, and they were the highest skilled workers. That was also testified to by Mr. Acne. So the only reason why she didn't come back instantly at that time was because she was going through the FMLA leave related to her knee condition. That position was never filled. There's testimony to that effect. And once again, to finish my thought, the main issue here that I want to make sure we don't get lost on, Your Honors, is they never even had that discussion, and that's the central problem here. If they would have went through all this analysis and then ultimately came to the determination of undue burden or you're not qualified, I think we would have more of an argument here. But the lack of the discussion as set forth by the amount of Sixth Circuit precedent in this case disqualifies really the rest that comes after it because they didn't go through that process. Thank you. By the way, how long was your client employed there? She started there in September of 2016, so about three and a half years. Then she had some medical leave. Her employment ended in July of 2020. All right. So September of 2016 to July of 2020. Okay. Thank you. Good morning. Good morning, Your Honors. May it please the Court. My name is Amy Luck. I'm here on behalf of Decorative Paint. I have a question about whether your client went through the interactive process to try to resolve this request for an accommodation. What did your client do or how did that interactive process unfold if it did or was there such a process here? We contend that there was. We would agree, Decorative Paint would agree, that there was a request for accommodation and it was in the note. Ms. Root testified that she handed her note to Chris Acne in the morning. She plucked in around 3 o'clock in the morning. She handed a note to Chris and said, I can't breathe, here's a doctor's note. He handed it to the mailbox of the HR director who arrived later that day, who read it and thought, oh, my goodness, we have someone who can't breathe and is unsafe around paint fumes. So Ms. Fuller went to leadership and showed them the note and said, how can we accommodate this? Can you guys help me on the production floor? What ideas do you have to accommodate this? And all of them said, we are one big paint fume. There's nowhere in this building that's not around paint fumes. So she called Robbie Roberts, who's the client manager, and he was her witness during the meeting with Ms. Fuller. They met with Ms. Fuller. They said, we received your note. It says you can't work around paint fumes. We don't know how to accommodate that. And Ms. Root's response was, so you're firing me. So you're laying me off. There's testimony from Ms. Root that she now believes or left with the understanding that she was fired. So now we have a question of, I mean, our position is we didn't fire her. So counsel said, just to follow up on that, the plaintiff presents a note. The employee then convenes a meeting. And at the meeting, they don't say you can go back to your prior job where the fumes were less present or whatever. They just say go home immediately. And then the plaintiff claims that thereafter the employee refused to speak to her or engage with her. Are you going to say that those facts were enough to constitute an interactive process or discussion with the plaintiff? She comes up with this note. A meeting is convened, and she's told to go home, and that's it? No, that is not it. They told her, we've read your note, and the way we read it is you're not safe in the building, much less being able to work around paint fumes. But they didn't get any feedback. They just said go home immediately is what she's claiming. Now, maybe her representation of the events is inaccurate, but that's how she's describing what unfolded. Ms. Root admitted that she read the note before she turned it in and that she understood the note, and she understood that paint fumes are everywhere in the building. So she knew, or she should have known, when she read her note, how someone else would read it. Aren't you misrepresenting her position a little bit? She didn't come in and say that I know there's paint fumes everywhere and I can't breathe and I can't be here or even imply that. That's not what she communicated. She communicated, this is my note, so you can't accommodate that, then I'll take it back. She also communicated, in our view, and she admitted that she may have said it, even if she forgot she said it. May have said what? May have said, what should I have my doctor say? What's wrong with asking that? What's that? What is wrong with asking? There's nothing wrong with asking that, but there is something wrong with decorative paint telling her what her doctor should say. And what our testimony is from both Ms. Fuller and Robbie Roberts is that they said, we can't tell you what your doctor should say, but you need to go back to your doctor and talk to her about what you can do here. Explain to her that we're a paint facility and that there are paint fumes everywhere, even in Rework. She admitted in her deposition testimony that there are paint fumes circulating throughout the building, including in Rework. So was it DPI's position that she did not request to go back to Rework? Yes. She admitted in her deposition testimony she said nothing about D-Line. She said nothing about moving away from D-Line. She said nothing about the fact that she could tolerate paint fumes on parts of D-Line but not in the part that she had been assigned that day. She admitted that she did not say anything about moving back to Rework. She admitted those things in her testimony. She had all of the information about which she and her doctor discussed. And the doctor's office, the doctor didn't write that note. She directed staff to write the note. So you folks have a factual dispute about this then? Because unless I misunderstood Ms. Root's counsel, Ms. Root did say that the accommodation I'm requesting is to go back to Rework. She did not say Rework or D-Line in her. But Judge Davis's question was, isn't that a genuine factual dispute about a material fact? It shows that she didn't participate in the interactive process, which was her obligation to explain that the note is not what we meant. Okay, so counsel for Ms. Root says, but they had a process which would have included giving her a form to take to her doctor. Why was that not done? Because if you look through Ms. Fuller's deposition, that line of questioning went back and forth between FMLA and ADA accommodations. Ms. Fuller testifies that she had the note. She didn't need to give her a form to have the doctor say again what was in the note. The note says she has COPD and asthma. The note says she should not work around paint fumes. That was the documentation. Ms. Fuller answers that question in her deposition testimony by saying she didn't need to provide a medical certification because she had the information. The note was clear to Decorative Paint that Ms. Root should not be working around paint fumes. Then why didn't they ask her to provide more information from the doctor? Because only the doctor could change the note, and they didn't want to be in a position where they put her back to work, which is her second request. Forget the note. I'll just go back to work. They said we can't do that. They said we can't unsee the note. The note says you shouldn't even be in the building. The note says it might be unsafe for you. We have to resolve this, but we can't do it here because now you have a doctor's note that there's a liability for us and for you. It's not safe for you. We have to send you home. Please go back to your doctor and see if there's something they can do. So is it your client's position that when she did not do that, or even from the way I view the record, correspond with you in any way until she sued, that the employer had made the first step in the interactive process and she did not then participate? Yes. But she had an obligation either in the meeting or when she went home to say, wait a minute, Dr. Hagerman and I discussed something different, and the note didn't turn out the way I thought it would, and Decorative Paint didn't read the note literally and didn't interpret it any other way, and didn't interpret it in the way that maybe we meant. And she had an obligation to speak up and say, wait a minute, I just want to go back to rework. She says in her deposition she did not say that. I can give you a page site if you want. Yes. Okay. This is her deposition page instead of page ID, and I apologize for that. But she agreed the doctor's note did not mention the D-line. That's on page 136 of her deposition. She agreed that she did not request to be moved from the D-line when discussing the note with Decorative Paint. That's on page 140. She agreed it was possible. She asked, what should I have the doctor say in the new note? That's on page 139. She agreed. She said, never mind, I'll take the note back and go back to work. That's on page 139 and 147 of her deposition. She admits that she did not explain that she can breathe in rework, in the rework room. That's on page 142. She admits she did not offer to go back to Dr. Hagerman to clarify the note to what she meant. That's on page 147. Let me ask you this. She brings this note in. They have this relatively brief meeting. She never comes. She never returns to work thereafter. When was the plaintiff's employment terminated? Decorative Paint waited a few days because they expected Tina to come back with some sort of resolution from her doctor. When they didn't hear from her, there is testimony from Ms. Fuller that she remembers reaching out to Tina, and she doesn't remember whether it was a phone call or in person. And the plaintiff says, I never heard from her. So that's disputed. So about two days later, when they didn't hear from Tina, they went back and said, I guess she's not coming back, and I think there was a payroll timeline that they needed to resolve. So they terminated her on her last day. Her last day of what? Her last day that she was there. The day of the meeting. They went retroactive. Are you saying they dated determination back as of the date of that meeting? Yes.  Was that the point at which they were looking at, excused versus unexcused absences? Yes, they were holding her spot. So there's testimony that they didn't follow the policy about no call, no show. But this is different. They were waiting for her to come back to see if they could accommodate her. So they held it for a couple of days. So to go back retroactively and say, I guess she's not coming back, is not inappropriate. And did they advise her that she was terminated at that point and as of what date? I think it was July 22 because she came back July 21 and July 22. She was only there two days. The first day she came back after COVID. Okay, but when did they provide her with notice that she was terminated? I don't know that they followed up with a letter advising her she was terminated. I don't know that they followed that with every employee. There's nothing in the record that they ever advised her, at least not in writing. And she claims she never heard from them again. She testified that she applied for unemployment the very next, I mean immediately. Immediately meaning when? There's testimony that she didn't have any break, that she received unemployment straight through, even including the week. But you mean that she, having decided that when they said this was a problem and they needed more information, when she decided that meant she was terminated, that she then applied for unemployment? Yes. Immediately? I think there's no, I think that is probably true, that she left with the understanding according to her affidavit that was submitted after her deposition testimony. She left thinking she had been terminated. Is that? She was mad and she was upset.  She, in her deposition she said, they told me I was fired. In Ms. Fuller and Robbie Roberts' depositions they said, she asked, so you're firing me three times, and we said no each time. But she was upset. It's our testimony that she just left with the misunderstanding that she had been fired she didn't hear or didn't want. So my question was, is her affidavit, the subsequent affidavit, inconsistent with her deposition testimony? Yes. I think they qualified it. The last paragraph, paragraph 15 of her affidavit that was submitted in support of the motion for partial summary judgment for plaintiff, says on the last line, I left with the understanding I was terminated. I think they realized that. She may have misunderstood. If you don't mind, I might conclude. I have less than a minute. We want to stress that if this court finds Ms. Root demonstrated she is disabled under this record of evidence, the standard will have been lowered for that determination. There was no record of diagnosis, and she did not assert she was sufficiently limited in her breathing or working. She now says that she could tolerate paint fumes in certain areas of the paint facility, which contradicts her doctor's note and calls into question whether she is sufficiently limited in breathing and working. The only place in her complaint that asserts she was limited was in what she describes as a small room filled with paint fumes and poor ventilation, and anyone, whether they have COPD and asthma or not, would struggle to breathe in that kind of environment. If this court finds Ms. Root demonstrated she is qualified for her job, it will have to do so by disregarding the plain evidence of a note from her doctor that stated she should not work around paint fumes, her job description that states exposure to paint fumes was part of the job and therefore an essential function, and Ms. Root's own testimony acknowledging paint fumes circulate throughout the paint facility. May I say one more? I'm out of time. Well, your red light is on, so you might want to wrap up. I will, if you don't mind. One more.  Okay. A finding by this court that decorative paint failed to accommodate Ms. Root by refusing to engage in the interactive process will send the message to employers in the circuit that when an employee provides a doctor's note requesting an impossible accommodation and the employer discusses that impossibility with the employee, it is up to the employer to second-guess the doctor or the employee, in this case to ask whether Ms. Root could really be around paint fumes or how many paint fumes she could be around, which directly contradicts her doctor's note. Or if an employee says to forget the note, to disregard it, it would send the message that it is not the responsibility of the employee to explain a known error in a doctor's note, that once an employee requests an accommodation, even if that accommodation is impossible and she knows that, the employee's duty in the interactive process is complete. The employee can just sit back and blame the employer for not knowing what she and her doctor discussed. We submit that this result runs contrary to the ADA, and we request that this court affirm the district court's decision. Thank you. Thank you very much. Any rebuttal? Yes, Your Honor. Thank you. Thank you, Your Honor. Respectfully, the entire argument by Appley in this case is to do the opposite of what they're suggesting that Ms. Root was trying to do, and that's change the standard. They're the ones trying to change the standard. The standard is very clear. I mean, we can just agree what the standard is, as set forth by the precedent in this case. Their standard would be that apparently an employee has to come in to a meeting or to their employer and have every question already answered, essentially. That's essentially what the argument just was. It's that the note has to be perfect. If you bring in a doctor's note, do so at your own peril. Let me ask you this. If that's the position that you're taking, aren't you essentially saying when an employee comes in with a note that is very blunt, very flat, as this note was, she can't be around fumes, if the employer says, give us more information so we can figure this out, and the employee does not do that, and you don't deny that she did not do that, right? I mean, there's no question that she didn't respond to that. So are you saying that an employer is then, under the law, in a situation of being bound to just bid against itself until it comes up with something that the employee thinks is satisfactory? Absolutely not, Your Honor. The missing step in that analysis is that the part about them requesting more information, that never happened. That is a made-up fact in this case. You will not find it anywhere in the record, and I will say that that boldly. You will not find anywhere in the record where that actually happened. There is not one document supporting that. There is no testimony supporting that. This idea that they had this interactive discussion with leadership, well, here's the testimony on that. Ms. Fuller said something very broadly about, oh, yeah, I got this letter and I discussed it. One of the people that she testified under oath, that she discussed it with, was Robbie Roberts, who then testified an hour later during his deposition under oath that that never happened. He never saw the note, heard about it, or heard anything about this until they got in that room. There's a lot of other credibility issues with Ms. Fuller. The idea that she tried to contact my client after the fact, we disproved that through phone records. These are all questions of fact on that particular issue. At the very least, if the court decides to stop short of reversing on Ms. Root's motion for summary judgment on the failure to accommodate claim, then this case should at least proceed to trial because there's disputes of fact as to all the other issues, the disability discrimination claim and abounds. No, if the facts were as exactly as you said, no, of course not. The employer doesn't have to keep guessing or keep going on, but they have to engage in the process from the beginning, which they never did. Because cases like Burns v. Coca-Cola, Smith v. Henderson, Aldini v. Kroger, a number of Sixth Circuit decisions all say the same thing, which is the burden on the employee initially is very minimal. They have to come in and even in the Sayers case, just suggest the existence of a plausible accommodation. Employees don't have to use magic words. They don't even have to use the word accommodation when it's involving a potential transfer or reassignment to a position. In the Burns case, it was quoted as simple as, I want to keep working for you. Do you have any suggestions? Even that was upheld as a reasonable enough request for accommodation. At that point, the burden shifts to the employer to actually conduct both the individualized inquiry in terms of qualification. They can't just look at a letter. And to your point, Judge, as to, because you said the letter was as blunt as it was, and I would point again that that was the same facts in the Lovell case, where the district court found for summary judgment in favor of the plaintiff because there was no follow-up. That doesn't match the facts either because Fuller and Roberts both testified that they actually didn't, it was unclear to them exactly what the letter was asserting. So contrary to what their counsel has stated up here that this was just that simple and they couldn't possibly ask any questions, they shouldn't ask any questions and all this other stuff, that's not even what their own witnesses say. Their own witnesses admitted that it was unclear exactly what the letter was seeking and that's the nail in the coffin in terms of you then have to follow up as the employer and actually inquire about these things. That is the purpose of the ADA, especially post-2008 with the Amendments Act, for broad coverage. We cannot set a standard where an employee has to come in, and if they're not armed with every single question already answered, the employer can now suddenly be willfully blind and say, well, you provided us a letter, we're going to shut our eyes, plug our ears, and not ask any questions and just say, you're a liability, go home, and we're never speaking to you again. Those are the facts of this case. That's what's supported in the record, and I know I'm out of time. We would ask that this court reverse the decision on summary judgment that was in favor of the appellee and, quite frankly, to reverse the decision on summary judgment as to the failure to accommodate claim and grant summary judgment for Ms. Rue because of the facts in this case and the impact of the Lovell decision. I thank you very much for your time. Thank you very much. The case is submitted.